INDECOR, INC., Plaintiff,

v.

FOX–WELLS & CO., INC., Defendant.

No. 83–5739 (PKL).

United States District Court,
S.D. New York.

Sept. 3, 1986.

Dressler, Goldsmith, Shore, Sutker & Milnamow, Ltd., Chicago, Ill. (John P. Milnamow, Henry S. Kaplan, of counsel), Patterson, Belknap, Webb & Tyler, New York City (David F. Dobbins, Linda Novak, of counsel), for plaintiff.

Fiddler & Levine, New York City (Alan H. Levine, Robert W. Fiddler, of counsel), for defendant.

## OPINION

LEISURE, District Judge:

This is an action by Indecor, Inc. ("Indecor") against Fox-Wells & Co., Inc. ("Fox-Wells") for infringement of claims 1–2 and 4–15 of United States Patent No. 4,377,195 ('195 Patent) entitled "Private Cubicle Enclosure." Indecor markets its product under the name KOMPLETE KUBE. Fox-Wells markets its product under the name TOTAL CUBE. Indecor seeks an injunction, damages and an award of costs and attorneys' fees. Jurisdiction for this action arises in this Court under the Patent Laws of the United States, 35 U.S.C. §§ 101 *et seq.*, and upon 28 U.S.C. § 1338. Venue is proper in this district pursuant to 28 U.S.C. § 1400(b).

As defined in the Pre-Trial Order, the issues to be tried with respect to liability are the following:

(1) Whether the cubicle enclosures made from Defendant's TOTAL CUBE fabric by Defendant's customers infringe claims 1–2 and 4–15 of the '195 Patent.

(2) Whether Defendant actively induced infringement of the '195 Patent.

(3) Whether TOTAL CUBE fabric as offered for sale by Defendant infringes claims 1–2 of the '195 Patent.

(4) Whether Defendant sells its TOTAL CUBE fabric knowing it to be especially made or especially adapted for use in cubicle enclosures that infringe the '195 Patent.

\*    \*    \*    \*    \*    \*

(6) Whether plaintiff is estopped from asserting that cubicle curtains comprising fabric not made of inherently flame retardant yarn materials infringe the '195 Patent.

(7) Whether the '195 Patent is valid.

(8) Whether the applicant for the '195 Patent failed to disclose the best mode contemplated of carrying out the invention.

(9) Whether Roger R. Varin was a joint inventor of the subject matter claimed in the '195 Patent.

This matter was tried to the Court without a jury on March 10 and 11, 1986 and May 1, 7, 8 and 9, 1986 on liability issues only. A trial on damages will take place subsequently. The following shall constitute the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## FINDINGS OF FACT

*Background*

The '195 Patent was issued in the name of Hans Jack Weil on March 22, 1983. Indecor is the exclusive licensee under the '195 Patent pursuant to a license agreement dated June 1, 1983. Indecor is an Illinois corporation, with its principal place of business at 5009 North Winthrop, Chicago, Illinois. Mr. Weil founded Indecor in 1950 and is its president. Fox-Wells is a New York corporation having a regular and established place of business at 58 West 40th Street, New York, New York.

It is common practice in non-private hospital rooms to use curtains drawn around each individual bed to provide privacy for the patient. Usually, the curtain is made

of a lower opaque portion to provide privacy, and an upper mesh portion to provide for the transmission of light and air into the private space. Along the top margin are eyelets or grommets to facilitate the support of the curtain. Conventionally, such a curtain is made of initially separate opaque and mesh fabrics which are sewn together. The standard cubicle curtain has a fabric portion made of jean cloth, usually 38 inches wide. Several sections are sewn together to make the width for the finished cubicle curtain. The nylon mesh portion was then sewn to the top of the jean cloth sections.

For safety reasons, a hospital cubicle curtain must be flame resistant. The jean cloth is usually treated to make it flame resistant. For the purposes of this action, the terms "flame resistant," "flame retardant," and "fire retardant" are used interchangeably. As a practical matter, this means that the curtain fabric must pass certain recognized tests, such as those prescribed by the National Fire Protection Association, and identified as the NFPA 701 small scale and NFPA 701 large scale tests. In conducting these tests, a sample of fabric is brought into contact with a flame, and the flame is then removed. To pass the test, the fabric must not burn for more than a specified period after the flame is removed. Any material which breaks away or drips from the test specimen must not burn after reaching the floor of the testing chamber. The vertical spread of burning, i.e., the "char length" must not exceed a certain length.

*Prior Art*

Other cubicle curtain constructions that were known before the '195 Patent are shown in Boerner U.S. Patent No. 3,321,003 and Tames U.S. Patent No. 3,438,422. These patents were called to the attention of the Examiner in the specification of the '195 Patent application. The Boerner patent discloses a hanging drapery assembly for use in hospital rooms which has upper and lower sections attached to each other. The Tames patent discloses a ventilating curtain for hospital rooms which employs a complicated and costly construction to provide an upper portion with ventilating openings which do not become clogged with airborne cotton lint normally present in the atmosphere of hospital rooms. This patent contemplates the attachment of the lower and upper portions.

Private cubicle enclosure curtains that were known before the '195 Patent had many problems and disadvantages that were overcome by the Weil invention. Because the upper and lower portions of the prior art cubicle enclosure curtains were made of different materials, the two portions had different wear, maintenance and laundering characteristics. Also, the upper and lower portions were not uniform in color. For example, it was common for the nylon upper mesh portion to become brittle and prematurely wear out after repeated laudering. The nylon, which originally was white, tended to yellow after time. Since the manufacture of the prior art cubicle enclosure curtain involved sewing together several fabric sections for the lower portion, and then sewing the lower fabric portion to the upper mesh portion, the construction of the prior art curtain was labor intensive and costly. The multiple seams this process entailed caused problems such as puckering, breaking and they provided a site for the accumulation of bacteria. Cubicle curtains for use in hospital areas where there was frequent spillage of blood and other solutions were made with an impervious plastic sheet material called Staph Check.

Before the '195 Patent, it was also known to make fabrics with an open lace-like portion at one end and a more closely woven portion at the opposite end. U.S. Patent No. 2,125,422 and No. 2,037,629 to Bosworth and to Holgate disclose such fabrics. These patents were called to the attention of the Examiner in the application for the '195 Patent. The Holgate patent, No. 2,037,629, shows a curtain for home window use made of an integrally woven fabric having adjacent tightly and loosely woven sections, the loosely woven section serving the purpose of passing light and

air. Similar woven constructions were described in two patents issued to Fischel, U.S. Patent No. 2,149,011 and U.S. Patent No. 2,416,438 and cited by the Examiner in the Official Action issued December 4, 1981. These Fischel patents do not suggest, however, the use of such woven fabrics as private cubicle enclosure curtains.

French Patent No. 1,366,224, issued June 1, 1964, introduced by Fox-Wells, discloses a window blind made of a fabric with alternating horizontal bands formed by tight weave and open weave. The fabric is made of fiberglass, an inherently flame resistant yarn. This patent does not suggest or disclose an integrally knit cubicle curtain for hospital use.

*The Weil Invention*

As part of its business, Indecor sold cubicle curtains to hospitals. Also, Indecor made draperies of VEREL and fiberglass fire resistant material. As a result of his experience in the cubicle enclosure business, Mr. Weil conceived of making an integral private cubicle enclosure curtain in the early 1970's in order to overcome the problems associated with the sewn multiple-section cubicle enclosure products that were then on the market.

Mr. Weil first experimented with the Staph Check material, which was sufficiently opaque to provide privacy to the bedridden patient. Since Staph Check was essentially impervious, Mr. Weil machine perforated the material to create openings for the transmission of air. Then, a 22" wide section of perforated Staph Check material was sewn to an unperforated 72" wide section of Staph Check material, to obtain a product that was comprised of the same color and material throughout. The perforated portion of the Staph Check material had adequate air transmission properties, but the perforations did not permit sufficient ventilating air to pass through. A private cubicle enclosure requires material with a minimum width of eight-to-nine feet. Since Staph Check was available only in a 72" width, further experimentation with the Staph Check material was discontinued.

Mr. Weil next experimented with opaque woven materials by perforating such material to provide for the passage of air. This was unsatisfactory since the perforations caused the woven material to fray around the perforations. Mr. Weil unsuccessfully expended a considerable amount of time and funds to develop a chemical to coat the fabric and bond the frayed fibers around the perforations. The chemical which prevented fraying at the perforations made the fabric too stiff. Also, the only looms available to weave material in a width suitable for a cubicle enclosure curtain were high volume production looms, which were not practical for the manufacture of such fabric.

In 1978, while visiting Israel, Mr. Weil observed knitting machines that were capable of knitting fabrics of almost unlimited width. This prompted him to conceive of knitting an integral cubicle enclosure curtain, although the problem still remained of simultaneously knitting and integrating a single fabric of mesh that was sufficiently open to pass light and air and a solid section sufficiently opaque to provide privacy. Upon his return from Israel, Mr. Weil contacted Professor Bruner of the Philadelphia School of Textiles and discussed with him the types of fabrics that could be produced by knitting machinery then available. These telephone discussions convinced Mr. Weil that an integral cubicle enclosure curtain with the requisite diverse physical properties could be made with available knitting technology.

Mr. Weil was reluctant to contact a large knitting mill because he felt that his concept had significant value and he was concerned that the proprietary nature of his idea could not be maintained in a large corporation. Professor Bruner suggested that Mr. Weil contact Dr. Roger Varin, the owner of Varinit Corporation ("Varinit"), a small knitting mill located in Greenville, South Carolina.

Dr. Varin has a graduate degree in biochemistry and was experienced in new product development as the former director of research for Riegel Textile Corporation.

Dr. Varin had many years of knitting experience and was knowledgeable with respect to knitted fabrics. He disclaimed any expertise in flame and fire resistant yarns and fabrics.

Mr. Weil contacted Dr. Varin by telephone on or about September 13, 1979. Dr. Varin was not familiar with cubicle enclosure curtains or their special requirements as to light and air. Mr. Weil explained to Dr. Varin the physical structure of the integrally knitted cubicle enclosure fabric. He told Dr. Varin that he wanted a knitted fabric of 100% polyester for hospital end use which would be flame resistant. Dr. Varin advised Mr. Weil that he could assist Mr. Weil in producing such a fabric.

On September 19, 1979, Mr. Weil wrote to Dr. Varin to confirm their telephone conversation and to forward to him a sample of a cubicle enclosure curtain made of a nylon mesh section sewn to a solid jean cloth fabric section. The purpose of the model was to indicate to Dr. Varin the stitch density that Mr. Weil wanted for the various sections of the integral cubicle enclosure fabric.

After Dr. Varin received the sample from Mr. Weil, they again discussed the project by telephone and Dr. Varin confirmed his earlier opinion that Varinit's equipment could knit the integral cubicle enclosure fabric with sections of the stitch density that Mr. Weil desired. Mr. Weil asked Dr. Varin to knit prototype cubicle enclosure fabrics for Mr. Weil to evaluate. Dr. Varin furnished such prototype fabrics within the next few months.

Based upon his involvement in the contract fabricating business, Mr. Weil was aware in 1979 that yarns then in use for flame retardant fabrics had a tendency to shrink during laundering, thereby damaging the fabric. At this time, Mr. Weil became aware of TREVIRA type polyester yarn, made by Hoechst Fibers Industries ("Hoechst"), which was a superior flame resistant yarn that could be laundered at higher temperatures than other yarns without shrinking.

After receiving the Dr. Varin's initial prototype samples from Varinit, Mr. Weil suggested to Dr. Varin in November of 1979 that the cubicle enclosure fabric should be made of a yarn like the TREVIRA type polyester material, and asked Dr. Varin to investigate what yarns of that type were then available. Dr. Varin first approached Monsanto, which did not make a fire resistant fiber or yarn. DuPont told Dr. Varin that its Dacron polyester did not pass the NFPA–701 tests, but that Hoechst made a fire retardant polyester. Dr. Varin learned from Hoechst that its TREVIRA 692 yarn was fire retardant. (More recently, Hoechst refers to this yarn as "TREVIRA 695.") TREVIRA type polyester yarn is an inherently flame resistant yarn material. Simply stated, this means that when a fabric made of TREVIRA type polyester yarn material is subjected to flame, and the flame is removed, the fabric does not continue to burn.

Dr. Varin realized that the cubicle curtain fabric could be made out of regular polyester, such as Dacron, after which the fabric could be provided with a flame retardant finish. In March of 1980, however, Mr. Weil decided that the cubicle enclosure fabric should be made using the TREVIRA polyester yarn. Mr. Weil was dissatisfied with the other polyester yarns, and had determined that TREVIRA would be most suitable. Accordingly, Mr. Weil instructed Dr. Varin to make a commercial run of cubicle enclosure fabric made of TREVIRA polyester yarn. Successful flammability tests were conducted on samples of that commercial run by Hoechst Fibers Industries in the summer of 1980.

Making the cubicle curtain fabric described in the '195 Patent involves knitting the solid and mesh portions simultaneously on one knitting machine. Yarn must be fed to the machine at different rates in the section of the machine knitting the solid portion of the fabric and in the section of the machine knitting the mesh portion. Through painstaking analysis, the knitting machine is set up and adjusted to resolve this problem. After the fabric is knitted, it is stretched and heat set. Steps must

therefore be taken in knitting the fabric so that after stretching the mesh openings have the desired final shape.

Dr. Varin, in his deposition testimony introduced into evidence as part of these proceedings, described how the resolution of these problems varied from machine to machine and required the operator to find an optimum setting for all the machine's variables. He stated that while it was easy to make a ten-yard sample, making a commercial production run was more challenging. Dr. Varin stated that the '195 Patent at Column 6, line 53 through Column 7 to the claims, describes how to set up a particular type and brand of knitting machine to knit mesh and solid fabric at the same time. When he was asked how to knit the openings of the mesh so that they will result in the desired shape after they are heat stretched, Dr. Varin refused claiming that it constituted Varinit's proprietary information.

Mr. Weil does not know how a knitting machine is warped to create solid and mesh portions of a knitted fabric and does not know how a mesh-type fabric construction is created on a knitting machine. He does not know how to adjust a knitting machine to create mesh openings having different shapes. It was Dr. Varin, working under Mr. Weil's instructions, who resolved these problems in developing the patented invention.

*Prosecution History of the '195 Patent*

Mr. Weil informed Dr. Varin of his intent to file a patent application on the KOMPLETE KUBE fabric. Because of Dr. Varin's extensive background in textile technology, Mr. Weil asked Dr. Varin to recommend a patent attorney. Dr. Varin suggested a New York City patent law firm that had done patent work for Dr. Varin in the past. Mr. Weil retained the firm to prepare and file a patent application on his behalf. Mr. Weil met with his patent attorney and provided him with all the information that he had with respect to the invention, including a sample of the fabric. Mr. Weil described conventional cubicle enclosure curtains that were then on the market and explained the differences between the conventional curtains and the KOMPLETE KUBE product. After the attorney searched the U.S. Patent & Trademark Office records and discussed the results with Mr. Weil, preparations of the patent application began. Pursuant to Mr. Weil's authorization and instruction, the attorney contacted Dr. Varin to obtain information about the knitting apparatus Varinit used to make the KOMPLETE KUBE product.

After he was satisfied that the patent application was a complete and accurate description of his invention, on June 17, 1980, Mr. Weil filed the application which matured into the '195 Patent. Before examination of the patent application took place, a document was filed calling attention to the patents that were located in the pre-filing search.

In an Official Action issued by the Patent Examiner on December 4, 1981, all the claims of the patent application were rejected as defining subject matter which was obvious in view of the disclosures of five earlier issued patents, namely, "Fishel [sic] (1) or (3) each in view of Boerner or Tames and considering Laywood, et al [a British patent] under 35 U.S.C. 103." The Examiner also made reference to a French patent.

Further, the Examiner rejected Claims 1 through 4 on more specific grounds, namely that they were "indefinite" or "incomplete" under 35 U.S.C. § 112, in that they failed to recite sufficient structure or structural characteristics of the fabric "to support the functional language of the claims, particularly the preamble of claims 1, 2 [which eventually became independent claims 1 and 6 of the patent]." The preamble of Claims 1 and 2 of the application disclosed a curtain "for use with a supporting structure." Weil patent application Claim 5, which contained a broad disclosure in the specification and claims of means that could be used to suspend the private cubicle enclosure from a supporting structure, was not rejected by the December 4, 1981 Official Action under 35 U.S.C. § 112. Claim 5 of the application as originally filed, stated:

5. The integral ventilating curtain according to claim 4 wherein said third section comprises means positioned thereon to suspend the entire fabric construction from a supporting structure.

Thus, Claim 5 states that the third section *is* the means for suspending the entire fabric.

After Mr. Weil and his attorney had an interview with the Examiner, a response to the Official Action was filed on March 19, 1982. In his response, Mr. Weil argued that his cubicle enclosure differed from two of the earlier patents cited by the Examiner, since "[t]he products of these patents have different wear, washing and shrinking characteristics and are not formed in their entirety of inherently flame resistant yarn materials." Mr. Weil also addressed the Examiner's rejection of Claims 1 and 2 under 35 U.S.C. § 112 by cancelling original Claim 5 and incorporating the broad "means" to suspend the structure found therein into the independent claims of the Weil patent. Claim 1 was thus amended by adding the words "and means associated with said fabric for suspending the entire fabric construction from a supporting structure." Claim 2, later renumbered as Claim 6, was amended by the addition of the words "and means associated with the third section for suspending the entire fabric construction from a supporting structure." The "means" are illustrated as described in the patent as grommets by dependent Claim 9. According to the testimony of Mr. Weil and Dennis McGowan of Fox-Wells, the use of the "means" language in Claims 1 and 6, the independent claims of the patent, encompasses the header section of the Fox-Wells product, as well as other means, such as grommets, clamps and the like.

On or about March 17, 1982, two protests against issuance of a patent to Mr. Weil were filed. One protester submitted a sample of a cubicle curtain which his company marketed. The second protestor cited prior patents which he contended foreclosed the Weil application. By Official Action dated June 23, 1982, the Patent Examiner again rejected all the claims of the application on the basis of the materials submitted by the protestors and two of the patents previously cited.

After a further interview with the Patent Examiner, a response to the Official Action was filed on August 17, 1982. In that response, Mr. Weil stated that

> it would not be obvious to one having ordinary skill in the art, whether that art be the private cubicle enclosure art or the knitting art, to provide a multi-section integrally formed fabric of inherently flame resistant yarn materials ... and with the sections of fabric being constructed entirely from the same yarn materials to impart to the fabric uniform dyeing, wearing and washing characteristics.

Mr. Weil further stated that by making the cubicle enclosure of the "same inherently flame resistant yarn materials" the product is safe for use in hospitals and nursing homes.

> Economies of initial manufacture are realized, in that secondary manufacturing operations, such as stitching of a nylon mesh to an opaque fabric, are eliminated. Economies are realized by the end users of the claimed product, since all of the sections of the fabric of the private cubicle enclosure are formed of the same yarn materials and have the same wearing and washing characteristics, as compared to prior art multiple section stitched cubicle enclosures.

By Official Action dated November 3, 1982, the Patent Examiner allowed the patent to issue. As reasons for the allowance, the Examiner stated that the prior art of record contained "[n]o reasonable suggestion ... to integrally knit the various panels or sections as pursued herein for the environment specified." Further, he stated that the sample submitted by one of the protesters "has been considered but is ineffective, per se, to negate patentability." Upon payment of the requisite fees, U.S. Patent No. 4,377,195 was granted on March 22, 1983.

*The '195 Patent*

The '195 Patent, which discloses the commercial version of Mr. Weil's invention, describes and illustrates a knitted curtain intended for use in a hospital, where it can be drawn around the bed of a patient to provide privacy. The curtain may have three sections, namely, a lower densely knit section, a more loosely knit mesh section, and an upper densely knit section. The upper section can be provided with grommets for suspending the curtain from a support, the mesh section allows light and air into the private cubicle created by the curtain, and the lower section is relatively opaque to provide privacy. The '195 Patent describes the curtain as being knitted of "inherently flame resistant" or "inherently flame retardant" yarn materials. These terms are used at several different points in the descriptive portion of the patent. At two locations, the patent identifies a specific inherently flame resistant, or retardant, yarn of which the curtain can be made, namely, TREVIRA Types 271 and 692 polyester yarn.

The written specifications and drawings of the '195 Patent clearly show and describe the subject matters claimed in a sufficiently clear and concise manner to enable any person skilled in the art to make and use the patented product. Each and every element recited in the claims finds response in the written specification and drawings.

*Copying of the Weil Invention*

Indecor began to commercialize Mr. Weil's invention in the fall of 1980. On November 7, 1980, Indecor sold and shipped twenty yards of fabric to Lazarus Fabrics for photography purposes. On December 10, 1980, Indecor sold and shipped 3,597 yards of fabric to Lazarus Fabrics for resale to hospitals and similar institutions. Mr. Weil and Indecor had had a long-standing business relationship with Lazarus Fabrics, having bought material from them for over thirty years.

Mr. Weil and Indecor verbally agreed with Lazarus Fabrics that they would be the exclusive distributor of the subject of the Weil patent application, now referred to as KOMPLETE KUBE cubicle enclosure fabric. Lazarus Fabrics advertised the Indecor fabric under the name KOMPLETE KUBE for sale to the manufacturers of cubicle enclosure curtains. This exclusive distribution agreement between Indecor and Lazarus Fabrics lasted for about one year, and ended in the fall of 1980. During the course of the agreement with Lazarus Fabrics, Mr. Weil informed Joseph Finer of Lazarus Fabrics, that a patent application had been filed on the KOMPLETE KUBE product. Lazarus Fabrics included the Serial Number of the Weil patent application in its advertising materials.

Lazarus Fabrics and Finer also had a long-standing business relationship with Fox-Wells, having bought fabrics from Fox-Wells for several years. In or about March or April of 1981, Lazarus Fabrics submitted a sample of the Indecor KOMPLETE KUBE fabric to Fox-Wells and asked whether Fox-Wells could make such a product. The KOMPLETE KUBE sample was discussed at Fox-Wells by Charles Cox, the national sales manager of the contract sales division of Fox-Wells, and Dennis McGowan, the merchandise manager of raschel knitting for Fox-Wells.

Before Mr. Finer sent the KOMPLETE KUBE sample to Fox-Wells, defendant did not have a product of the nature of the KOMPLETE KUBE product, and no one at Fox-Wells had ever seen a knitted one-piece cubicle enclosure fabric before. Finer advised Fox-Wells that a patent application had been filed on the KOMPLETE KUBE product. When Mr. Cox showed the KOMPLETE KUBE sample to Mr. McGowan, Mr. Cox asked if Fox-Wells could make something similar to the KOMPLETE KUBE product. Mr. McGowan stated that he did not see any reason why not but advised that Fox-Wells could not do so on its existing equipment. He contacted Bill Katterman, a representative of Texfi Industries, a contract knitter that worked with Fox-Wells. When asked the same question, Mr. Katterman agreed that there was no reason why it could not be done.

Mr. McGowan flew immediately to Texfi Industries' plant in North Carolina, to show them the KOMPLETE KUBE sample. Mr. McGowan asked Texfi to make a fabric from TREVIRA 695 type yarn on Texfi equipment that would do the same job as the Indecor fabric. In or about June or July of 1981, Texfi submitted a sample fabric to Fox-Wells. This sample was rejected because it was stiff and lacked sufficient "drapability." The next prototype was made of regular conventional polyester. By September of 1981, Texfi produced for Fox-Wells a satisfactory fabric made of 100% Kodel polyester yarn. After the fabric was knitted, Fox-Wells treated it with a fire retardant chemical sold under the trademark GLOTARD NTB made by Glotex Chemical Co. Fox-Wells named its product TOTAL CUBE.

In late April or early May of 1981, Mr. Finer of Lazarus Fabrics advised Mr. Weil that Fox-Wells was in the process of producing a fabric like the KOMPLETE KUBE product. Mr. Weil immediately advised his attorney and instructed him to write to Fox-Wells and inform the company that Mr. Weil had filed a patent application for the KOMPLETE KUBE product. This letter was mailed on May 8, 1981, but Fox-Wells did not respond.

In or about January of 1982, Fox-Wells began to purchase the TOTAL CUBE knitted fabric from Texfi and to offer it for sale under the TOTAL CUBE name. In December of 1981, Fox-Wells asked Texfi to have its attorneys ascertain the status of the KOMPLETE KUBE patent application that they then thought had been filed by Lazarus Fabrics. In a letter dated January 20, 1982, Texfi's corporate attorneys informed Texfi and Fox-Wells that while the contents of the patent application were confidential, "[m]y Washington correspondent is going to try to get some more information on the Lazarus application, but it may take some time to do so as such matters cannot be ascertained through public records." Texfi's attorneys gave Fox-Wells the "go ahead" to market the TOTAL CUBE fabric, but only if "Texfi and Fox-Wells and Company developed your

fabric independently of Lazarus." Texfi's attorneys also gave the following further advice applicable in the event that a patent issued on the KOMPLETE KUBE product.

If the Lazarus patent issues and you find that your fabric infringes their patent for some reason, then you will have to determine who invented the fabric first. For that reason, whatever laboratory notes and records you might have as to the development of your fabric ought to be kept and filed where it can be found at a later date.

Under the circumstances, this advice was meaningless since Fox-Wells did not begin to develop the TOTAL CUBE product until after a sample of Indecor's KOMPLETE KUBE product had been received from Lazarus Fabrics.

The introduction of the TOTAL CUBE fabric by Fox-Wells in July, 1982 was accompanied by a pamphlet which emphasized the very features and advantages Indecor claimed for the KOMPLETE KUBE cubicle enclosure invention.

In early April of 1983, Fox-Wells received a letter from Indecor's attorney, dated March 30, 1983, advising Fox-Wells of the existence of the '195 Patent, which had been issued on March 22, 1983. Fox-Wells consulted a patent attorney who responded to Indecor's attorney on April 25, 1983, stating that the situation was being investigated. On May 31, 1983, Fox-Wells' attorney wrote again and stated that Fox-Wells did not infringe the patent because they sell fabric only, not cubicle enclosures, and because Fox-Wells' fabric was not made of inherently flame resistant yarn materials. By letter dated June 3, 1983, Indecor's attorney advised that the Fox-Wells product met every limitation of virtually every claim in the patent and, in the alternative, the manufacture and sale of the TOTAL CUBE product constituted contributory infringement and or active inducement of infringement. Counsel noted that the Fox-Wells sales literature described its product as a "cubicle curtain." Finally, with respect to the issue of inherently flame re-

sistant yarn materials, counsel asserted that the physical properties of the polyester material used in the TOTAL CUBE product were similar to those used in the KOMPLETE KUBE fabric and that Fox-Wells described its cubicle curtain as "flame resistant." Lastly, on June 22, 1983, Fox-Wells' counsel reiterated that his client did not make cubicle curtains and therefore did not directly infringe the patent. In addition, counsel noted that the yarn materials used to make the TOTAL CUBE fabric were treated for flame retardancy after the fabric was made.

Mr. McGowan testified that before this lawsuit was filed in August of 1983 that, so far as he was aware, the only investigation of the prior art made by Fox-Wells had been research he had done in his own library and through fabric libraries "to find out whatever I thought was necessary." Mr. McGowan did not consider himself an expert in the flame-retardant chemical field nor in the field of fabric manufacturing.

In April of 1984, after the instant action had been filed, Fox-Wells initiated a search of the prior art of record. In the April 25, 1984 letter requesting the search, Fox-Wells asked for examples of prior art that disclosed the following:

(1) An integrally knitted cubicle curtain fabric, i.e., a fabric knitted to provide a lower opaque portion and an upper mesh portion, made of regular polyester which is then treated to make it flame resistant;

(2) A knitted fabric made of an inherently flame resistant yarn which has integrally formed opaque and mesh portions.

This statement indicates that Fox-Wells was not aware of any prior art that disclosed or suggested the foregoing specifics.

*Objective Indicia of Invention*

For many years, problems existed with sewn multi-section cubicle enclosure curtains. Fox-Wells was actively engaged in the cubicle enclosure curtain business for many years. Its agents were aware of the problems associated with sewn multi-section cubicle enclosure curtains, and employed persons with similar skills, educational background and experience as those possessed by Mr. Weil. Such persons, however, did not independently develop the TOTAL CUBE product. TOTAL CUBE was developed only after Fox-Wells and Texfi had been given a sample of the KOMPLETE KUBE product. Fox-Wells' development efforts occurred as a direct result of demands from customers that Fox-Wells also have a product of the KOMPLETE KUBE type in the market.

Two separate entities filed protests to the allowance of the Weil patent. This demonstrates a strong interest by such businesses in marketing a product similar to the KOMPLETE KUBE product. Such companies, however, had not marketed a similar product. The only companies selling integrally knitted cubicle enclosure curtains in the United States are Indecor and Fox-Wells.

Dr. Varin, who had had years of experience in the development of new products and in knitting fabrics, had never seen or knitted a fabric having an open mesh section integral with a solid section.

Indecor experienced immediate and significant demand for the KOMPLETE KUBE product. Such sales were achieved with a minimum of expenditure on advertising and promotion—$116 was spent during the 1982–83 fiscal year. Indecor's fiscal year runs from November 1 to October 31. The sales for the fiscal years following introduction of the KOMPLETE KUBE product are as follows:

| YEAR | TOTAL YARDS | TOTAL DOLLARS |
|---|---|---|
| 1980–81 | 30,548 | $ 152,549 |
| 1981–82 | 95,399 | 751,612 |
| 1982–83 | 212,792 | 1,769,559 |
| 1983–84 | 211,667 | 1,520,665 |
| 1984–85 | 210,429 | 1,478,844 |

The KOMPLETE KUBE product received the Gold Medalion award in the "Other Fabrics" category from the Institute of Business Designers and Contract Magazine. This award is given to recognize "product design achievement."

*The Claims Infringed*

The TOTAL CUBE product which Fox-Wells offers for sale, and sells in the Unit-

ed States has been charged to infringe claims 1,2 and 4–15 of the '195 Patent. The asserted claims are reproduced below.

1. A private cubicle enclosure for use with a supporting structure, which enclosure comprises a fabric constructed of knitted, inherently flame resistant yarn materials, the fabric having a first warp knitted section having knitted stitches of a stitch density sufficient to render said first section sufficiently opaque to provide privacy for a user on one side thereof, the knitted stitches of said first section being of uniform stitch density throughout said first section, a second section directly contiguous with said first section and formed integrally with said first section, said second section being warp knitted and in the form of an open mesh construction having knitted stitches of lesser stitch density than the density of the knitted stitches of said first section to permit the passage of light and air therethrough to provide ventilation for the user, the knitted stitches of said second section being of uniform stitch density throughout said second section, said first and second sections being constructed entirely from the same yarn materials to impart to said fabric uniform dyeing, wearing and washing characteristics, and means associated with said fabric for suspending the entire fabric construction from a supporting structure.

2. The private cubicle enclosure according to claim 1 wherein said inherently flame resistant materials are thermoplastic yarn materials, said fabric being stretched and heat-set following knitting to provide said second section with said open mesh construction

*   *   *   *   *   *

4. A private cubicle enclosure according to claim 1 wherein the marginal edge of said second section is provided with reinforcing means, said suspending means being associated with said reinforcing means.

5. The private cubicle enclosure according to claim 4 wherein the marginal edge of said second section is folded over to provide said reinforcing means.

6. A private cubicle enclosure for use with a supporting structure, which enclosure comprises a fabric constructed of warp knitted, inherently flame resistant yarn materials, the fabric having a first warp knitted section having knitted stitches of a stitch density sufficient to render said first section sufficiently opaque to provide privacy for a user on one side thereof, the knitted stitches of said first section being of uniform stitch density throughout said first section, a second section directly contiguous with said first section and formed integrally with said first section, said second section being warp knitted and in the form of an open mesh construction having knitted stitches of lesser stitch density than the knitted stitches of said first section to permit the passage of light and ventilating air therethrough to provide ventilation for the user, the knitted stitches of said second section being of uniform stitch density throughout said second section, a third section directly contiguous with said second section and formed integrally with said second section, said third section being of warp knitted construction having knitted stitches of a stitch density greater than the stitch density of the warp knitted stitches of said second section and being of sufficient strength to support said fabric in suspended relation with a supporting structure, said first, second and third sections being constructed entirely from the same yarn materials to impart to said fabric uniform dyeing, wearing and washing characteristics, and means associated with the third section for suspending the entire fabric construction from a supporting structure.

7. The private cubicle enclosure according to claim 6 wherein said warp knitted fabric is dimensioned, configured and constructed to define at least one private cubicle enclosure for a bedridden patient.

8. The private cubicle enclosure according to claim 7 wherein said third section is folded upon itself to provide a rein-

forced marginal section capable of supporting the entire fabric structure from a supporting structure.

9. The private cubicle enclosure according to claim 6 wherein said means associated with said third section for suspending said entire fabric construction from a supporting structure comprises a plurality of grommets positioned in spaced relation along said third section.

10. The private cubicle enclosure according to claim 9 wherein the marginal edge portion opposite said third section is folded upon itself to provide a finished hemmed marginal portion.

11. The private cubicle enclosure according to claim 10 wherein the remaining marginal portions extending along opposed sides thereof are folded upon themselves to provide finished marginal hemmed portions.

12. The private cubicle enclosure according to claim 11 wherein said fabric is constructed of at least one inherently flame resistant polyester yarn material.

13. The private cubicle enclosure according to claim 12 wherein said at least one polyester yarn material is a textured heat-set yarn material.

14. The private cubicle enclosure according to claim 13 wherein said at least one textured polyester heat-set yarn material is 150 denier.

15. The private cubicle enclosure according to claim 14 wherein said fabric is constructed entirely of inherently flame resistant heat-set polyester yarns.

### Description of the TOTAL CUBE Product

Fox-Wells has admitted or stipulated to the following facts. The TOTAL CUBE fabric, which is flame resistant, is made of at least one textured, heat-set, polyester 150 denier thermoplastic yarn material. All of the TOTAL CUBE fabric is made from 100% Kodel polyester 150/30 z twist semi-dull disperse dyeable yarn. Fox-Wells applies a chemical to the fabric known as GLOTARD NTB, made by Glotex Chemical Company.

The TOTAL CUBE fabric has a first warp knitted section, having knitted stitches of stitch density sufficient to render the first section sufficiently opaque to provide privacy for a user on one side. The knitted stitches of this first section are of uniform stitch density throughout. The fabric of the second section is directly contiguous and is formed integrally with the first section.

The fabric of the TOTAL CUBE's second section is in the form of an open mesh construction with knitted stitches of lesser stitch density than those of the first section. The knitted stitches of the second section are of uniform stitch density throughout. The third section of the TOTAL CUBE fabric consists of a 5″ header directly contiguous with and formed integrally with the second section. This third section is warp knitted with a knitted stitch density greater than the density of the warp knitted stitches of the second section. The third section is of sufficient strength to support the entire fabric if suspended from a supporting structure. All three sections of the TOTAL CUBE fabric are made entirely from the same yarn materials, which imparts to the fabric uniform dyeing, wearing and washing characteristics.

Fox-Wells is aware that its customers make the TOTAL CUBE product into a private cubicle enclosure. Moreover, Fox-Wells has no actual knowledge of the TOTAL CUBE product being made into anything other than a private cubicle enclosure by its customers. The TOTAL CUBE product is manufactured so that the third section is made to be folded upon itself to provide a reinforced marginal section for receiving grommets. Fox-Wells has offered its TOTAL CUBE fabric for sale for use in making private cubicle enclosures. The Fox-Wells TOTAL CUBE introductory pamphlet states the following.

THESE THREE DIMENSIONS COMBINED ARE INTEGRALLY MANUFACTURED AS ONE PIECE OF FABRIC. THIS LENGTH INSURES THE MANUFACTURING OF A MAXIMUM

HEIGHT CUBICLE CURTAIN OF 98″, INCLUDING MESH.

ALL OTHER SIZES OF LESSER DIMENSIONS ARE OBTAINED BY CUTTING OFF FROM THE BASE OF THE FABRIC. THE 5″ HEADER AND 20″ MESH REMAIN CONSTANT.

THIS WIDTH INSURES THE CONSTRUCTION OF A TOTALLY SEAMLESS CUBICLE CURTAIN, REGARDLESS OF WIDTH. THE ONLY FABRICATION REQUIRED IS THE DOUBLING OF THE 5″ HEADER FOR GROMMETING AND THE SEWING OF BOTTOM AND SIDE HEMS.

THE FABRIC REMAINS INTACT AS ONE INTEGRAL UNIT WITH COLOR UNIFORMITY IN BOTH MESH AND SOLID. IT IS DIMENSIONALLY STABLE THROUGHOUT ENTIRE LENGTH.

### Flame Resistance of KODEL Polyester

"Inherently flame resistant yarn material," as that term is used in the '195 Patent, is material with flame resistance that derives from the essential characteristic of the fiber from which the fabric is made, without the addition of flame-retardant chemicals. Fox-Wells buys 100% KODEL polyester yarn material from Eastman Chemical Company, which advertises all of its polyesters as inherently flame resistant. Untreated KODEL polyester yarn material burns when subjected to a flame, but it will self-extinguish when the flame is removed. According to Eastman Chemical Company, "if ignited, [it will] burn slowly, melt, drop off when hanging free, and usually self-extinguishes."

R. Bruce Le Blanc, Ph.D., is an expert in flame resistant textiles. Upon Indecor's request, he tested the Fox-Wells untreated greige curtain fabric according to the NFPA 701 test. Dr. Le Blanc tested both the solid portion and the mesh portion. Based upon the results of his tests, he concluded that both the solid portion and the mesh portion of the Fox-Wells greige curtain fabric, the untreated 100% KODEL polyester fabric, will meet the requirements of the NFPA 701 small scale test. He also concluded that both portions of this fabric would meet the requirements of the FF3–71 and the FF–5–74 tests, more commonly known as the Children's Sleepwear Standards.

Fox-Wells' flame resistant fabric expert, Samuel Golub, Ph.D., did not conduct the NFPA 701 test on the untreated Fox-Wells material. On prior occasions, when he has conducted the NFPA 701 test on other kinds of polyesters, the material sometimes self-extinguishes when ignited. Dr. Golub also testified that polyester fiber is the most commonly used fiber for children's sleepwear. Approximately 90% of the fabric used for children's sleepwear is untreated polyester material. Mr. McGowan, Fox-Wells' raschel knitting merchandise manager, testified that untreated regular polyester sometimes passes the NFPA 701 test.

According to Dr. LeBlanc, because of the after-flame requirements of the NFPA 701 test, heavier weight woven fabrics do not pass the NFPA test. The Hoechst Fibers Industries technical bulletin contains the following description of the TREVIRA Type 271 and 692 polyester yarns.

These polyesters are modified by incorporating a proprietary phosphorus compound into the polyethylene terephthalate chain to *enhance* flame resistance in fabrics. In the presence of a flame, fabrics of these fibers will melt and burn; however, properly constructed and finished fabrics will self extinguish when the ignition source is removed. (Emphasis added.)

Dr. Golub testified that compared to regular polyester, TREVIRA is "much more flame-retardant." The amount of phosphorus added to raw polyester to make the TREVIRA fiber is, according to Dr. LeBlanc, one-tenth the amount of phosphorous normally used on fabrics to make them flame-resistant. According to Dr. LeBlanc, at the time Hoechst introduced its TREVIRA fibers, the Children's Sleepwear Standard had a requirement that fabrics should be tested not only in the plain fabric area but at the seams and trim of gar-

ments. As a result of this requirement, regular polyester would occasionally fail at the seams where the residual flame was greater than ten seconds. After the Children's Sleepwear Standard was amended to eliminate the residual flame criteria, TREVIRA 271 became redundant and regular polyester became acceptable for children's sleepwear flame-resistant fabrics.

The foregoing evidence, particularly the testimony and demonstrations conducted by Dr. LeBlanc, convincingly shows that KODEL polyester yarn is an inherently flame resistant yarn. The fact that Fox-Wells applies a flame retardant coating of GLOTARD NTB to its TOTAL CUBE product does not alter the intrinsic flame resistant properties of KODEL polyester. Such a coating may enhance the flame resistance of the polyester, but it does not negate the fact that untreated polyester does have inherent flame resistant characteristics. Accordingly, KODEL polyester yarn material is "inherently flame resistant yarn material" as that term is used in the '195 Patent and understood by those skilled in the art.

*Fox-Wells' Conduct With Regard To The Patent And This Litigation*

Before Fox-Wells introduced its TOTAL CUBE product, it knew that Indecor had filed a patent application on its KOMPLETE KUBE product. Texfi and Fox-Wells copied the KOMPLETE KUBE product in designing the TOTAL CUBE product. Texfi's attorneys advised Fox-Wells and Texfit that the integrally knitted cubicle enclosure was an invention, and that the sale of the TOTAL CUBE product might be an infringement of the patent on the KOMPLETE KUBE product in the event a patent directed to that product issued. Upon issuance, a copy of the '195 Patent was sent to Fox-Wells, but defendant made no subsequent effort to avoid infringement, such as making changes in the TOTAL CUBE product. Fox-Wells did not make an investigation of the prior art to ascertain the scope and validity of the '195 Patent for more than one year after defendant received a copy of the patent. After such an investigation was finally made, no opin-

ion of counsel was rendered with respect to the scope and validity of the '195 Patent. Fox-Wells continued to sell the TOTAL CUBE product after it was aware of the '195 Patent.

Fox-Wells' own publicity instructs its customers how to suspend the TOTAL CUBE fabric from a supporting structure, but it denies that it intends for its TOTAL CUBE fabric to be made into cubicle enclosures to be so used.

After the close of discovery, Fox-Wells attempted to raise for the first time a defense of improper inventorship. Over Indecor's objection, on June 19, 1984, Judge Ward granted leave to Fox-Wells to file an Amended Answer raising the defense of improper inventorship, reopened discovery to July 31, 1984, and extended the deadline for submission of the Pre-Trial Order to August 14, 1984. Only after Indecor filed a Rule 37 motion did Fox-Wells provide Interrogatory answers with respect to this issue on August 10, 1984. When Indecor withdrew its Rule 37 motion, Judge Ward noted it was "withdrawn without prejudice to subsequent applications for costs and reasonable attorneys' fees." Fox-Wells took no discovery on the newly raised issue of improper inventorship.

The parties had agreed to exchange samples of the materials used to make the KOMPLETE KUBE and TOTAL CUBE products. While Indecor timely supplied such samples, Fox-Wells did so only after a direction was issued by the Court on June 5, 1985, and even then Fox-Wells belatedly supplied a quantity insufficient to be evaluated meaningfully by Indecor's expert witness.

On January 13, 1986, the Court set this matter for trial to begin on March 17, 1986. On February 24, 1986, in order to accommodate two Fox-Wells' witnesses who could not make the March 17, 1986 trial date, the trial was rescheduled to March 10, 1986. On February 26, 1986, Fox-Well announced that it intended to "substitute" George Henderson from Glo-Tex Chemical Company for Mr. Hancock as a technical expert for Fox-Wells. Fox-Wells had not supplied,

as requested, a report of Mr. Henderson's testimony or his resume. Subsequently, on or around March 3, 1986, Fox-Wells designated Mr. Golub as an expert witness. Mr. Golub was deposed on March 10, 1986. Finally, Fox-Wells failed to produce a sufficiently large sample, for testing purposes, of the TOTAL CUBE product that had not been treated with GLOTARD NTB until less than one week before the March 10, 1986 trial date.

## CONCLUSIONS OF LAW

This Court's jurisdiction over the parties and the subject matter of this action is conferred by 28 U.S.C. § 1338. Venue is proper in this district under 28 U.S.C. § 1400.

*Patent Validity*

■ Patents are born valid. 35 U.S.C. § 282; *Roper Corp. v. Litton Systems, Inc.,* 757 F.2d 1266, 1270 (Fed.Cir.1985). Pursuant to 35 U.S.C. § 282, a patent shall be presumed valid and each claim of a patent shall be presumed valid independently of other claims. In this case, the defendant has the burden of establishing the invalidity of a patent. 35 U.S.C. § 282. Invalidity must be shown by clear and convincing evidence. *Jamesbury Corp. v. Litton Industrial Products, Inc.,* 756 F.2d 1556, 1559 (Fed.Cir.1985). The presumption of validity is "made heavier" where the prior art relied upon by the defendant is the same as and no better than that considered and rejected by the Patent Office. *Fromson v. Advance Offset Plate, Inc.,* 755 F.2d 1549, 1555 (Fed.Cir.1985); *American Hoist & Derrick Co. v. Sowa & Sons,* 725 F.2d 1350, 1359–60 (Fed.Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984). The claims of a patent are the sole measure of the grant. *Aro Manufacturing Co. v. Convertible Top Replacement Co.,* 365 U.S. 336, 339, 81 S.Ct. 599, 600–01, 5 L.Ed.2d 592 (1961).

*Obviousness*

■ Under 35 U.S.C. § 103, in order for a patent to issue, the difference between the subject matter sought to be patented and the prior art must be such that the subject matter as a whole would not have been obvious at the time the invention was made to a person having ordinary skill in the art to which the invention pertains. The issue of obviousness may be determined by considering the following: (1) the scope and content of prior art; (2) the differences between prior art and the claims at issue; and (3) the level of ordinary skill in the pertinent art. *Graham v. John Deere Co.,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1966). Secondary indicia of non-obviousness include the commercial success of the patented subject matter, a "long felt but unsolved need [ ]" for the patented subject matter and the failure of others similarly situated to the inventor to create the patented subject matter. *Id.* at 17–18, 86 S.Ct. at 693–94; *Simmons Fastener Corp. v. Illinois Tool Works, Inc.,* 739 F.2d 1573, 1574–75 (Fed.Cir.1984), *cert. denied* 471 U.S. 1065, 105 S.Ct. 2138, 85 L.Ed.2d 496 (1985).

■ The art to which the '195 Patent is directed is private cubicle enclosure curtains for use in hospitals and similar institutions. The level of ordinary skill in the art may be determined by considering all, or some of the following factors.

(1) the educational level of the inventor;

(2) type of problems encountered in the art;

(3) prior art solutions to those problems;

(4) rapidity with which innovations are made;

(5) sophistication of the technology; and

(6) educational level of active workers in the field.

*Environmental Designs, Ltd. v. Union Oil Co.,* 713 F.2d 693, 696 (Fed.Cir.1983), *cert. denied,* 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984). Based on these criteria, a person of ordinary skill in the relevant art is a person who through education, training, and experience is (1) thoroughly familiar with the purpose and function of a private cubicle enclosure; (2) generally familiar with fabrics and their physical properties, including flame retardancy;

and (3) generally familiar with methods of manufacturing fabrics. Such a hypothetical person may, but need not, have a college degree. Years of practical experience in the field of textiles and fabrics suitable for institutional use may provide such a hypothetical person with ordinary skill.

■ On the basis of the findings of fact entered herein, the Court holds that the subject matter as a whole, as set forth in Claims 1–2 and 4–15 of U.S. Patent No. 4,377,195, would not have been obvious to one of ordinary skill in the art to which the invention pertains at the time of application for the patent. The evidence also shows that there were long perceived and unsolved problems in the art and that the patented product enjoyed commercial success. In addition, the defendant's use of a sample of the patented product to manufacture its product pays to the invention "the tribute of its imitation." *Diamond Rubber Co. v. Consolidated Rubber Tire Co.,* 220 U.S. 428, 441, 31 S.Ct. 444, 450, 55 L.Ed. 527 (1911). These secondary considerations provide further support for the conclusion of non-obviousness.

Defendant has argued that the '195 Patent involves nothing more than simply making out of one piece what had previously been made out of two pieces. Such a change is not patentable. *See In re Larson,* 340 F.2d 965 (C.C.P.A.1965). To the contrary, by making the integral cubicle curtain, more has been accomplished than merely making one piece out of two. *See generally In re Fridolph,* 309 F.2d 509, 512 (C.C.P.A.1962) quoting *In re Otto,* 121 F.2d 553, 555 (C.C.P.A.1941). Mr. Weil's invention provides uniform washing and shrinking characteristics and is designed to avoid costly and time-consuming manufacturing operations. These features demonstrate that the changes introduced by the Weil invention not only improve the performance of cubicle enclosure curtains but renders the manufacturing process simpler and more economical.

*Best Mode*

■ Defendant contends that the '195 Patent fails to disclose the best mode of carrying out the invention. *See* 35 U.S.C. § 112. The purpose of the best mode requirement "is to restrain inventors from applying for patents while at the same time concealing from the public preferred embodiments of their inventions which they have in fact conceived." *In re Gay,* 309 F.2d 769, 772 (C.C.P.A.1962). Best mode is a question of fact. *DeGeorge v. Bernier,* 768 F.2d 1318, 1324 (Fed.Cir.1985). Failure to comply with the best mode requirement amounts to concealing the preferred mode contemplated by the applicant at the time the patent application is filed. *Id.; In re Gay,* 309 F.2d at 772–73.

> [T]here is no objective standard by which to judge the adequacy of a best mode disclosure. Instead, only evidence of concealment (accidental or intentional) is to be considered. That evidence, in order to result in affirmance of a best mode rejection, must tend to show that the *quality* of an applicant's best mode disclosure is so poor as to effectively result in concealment.

*In re Sherwood,* 613 F.2d 809, 816 (C.C.P.A.1980) (emphasis in original) (footnotes omitted), *cert. denied,* 450 U.S. 994, 101 S.Ct. 1694, 68 L.Ed.2d 193 (1981); *see, e.g., Union Carbide Corp. v. Borg-Warner Corp.,* 550 F.2d 355 (6th Cir.1977) (generic disclosure of "extruder" apparatus as best mode insufficient where inventor considered a special type of extruder as necessary and desirable for invention); *Dale Electronics, Inc. v. R.C.L. Electronics, Inc.,* 488 F.2d 382, 388–89 (1st Cir.1973) (disclosure of a class of compounds as "recommended hardenable insulative material" inadequate where inventor testified that certain materials within the class did not work and one in particular worked very well).

■ Mr. Weil testified that no information was withheld from his patent application when it was prepared, and that the patent application discloses the preferred embodiment of his invention. Fox-Wells contends, nonetheless, that the patent does not disclose Dr. Varin's solutions to the problems presented by the need to feed

yarn at differing rates to create simultaneously solid and mesh portions and how to knit the mesh portion in anticipation of heat setting and stretching.

Defendant does not contend that the patent fails to satisfy the enablement requirement of 35 U.S.C. § 112. Thus, it is conceded that the patent contains a written description of the invention in terms that would enable any person skilled in the art to which it pertains to make and use it. While enablement relates to the manner and process of making and using the invention, best mode is concerned with carrying out the invention. The question of whether a patent adequately discloses the best mode of carrying out the invention "is in no way related to the question of the specification's sufficiency in complying with the enablement requirement." *In re Sherwood,* 613 F.2d at 816 n. 4.

Best mode requires the inventor to describe a specific embodiment of the product invented. *In re Gay,* 309 F.2d at 773. The '195 Patent describes in great detail Mr. Weil's preferred embodiment of the invention. Fox-Wells' complaint that Dr. Varin failed to disclose, on Mr. Weil's behalf, the specific details of warping the knitting machine and adjusting it to achieve a commercial run of the fabric misstates the issue. The '195 Patent concerns a fabric, not the details of a knitting process or a knitting machine. *Cf. DeGeorge v. Bernier,* 768 F.2d at 1324 (best mode disclosed despite lack of information about the word processor where the claim did not include a word processor). In other words, Dr. Varin's failure to disclose every last detail of the knitting process does not affect in any way whether the '195 Patent adequately disclosed the inventor's preferred embodiment of the invention.

*Inventorship*

■ The burden of showing non-joinder of inventors is by clear and convincing evidence. *Garrett Corp. v. United States,* 190 Ct.Cl. 858, 422 F.2d 874, 880, *cert. denied,* 400 U.S. 951, 91 S.Ct. 242, 27 L.Ed.2d 257 (1970). The inventor named in the patent is presumed to be correct.

*Amax Fly Ash Corp. v. United States,* 206 Ct.Cl. 756, 514 F.2d 1041, 1047 (1975). Once conception has occurred, the inventor may use the services, ideas, and aid of others in the process of perfecting an invention without losing his right to a patent. *Shatterproof Glass Corp. v. Libbey-Owens Ford Co.,* 758 F.2d 613, 624 (Fed.Cir.) (quotation omitted), *cert. dismissed,* — U.S. ——, 106 S.Ct. 340, 88 L.Ed.2d 326 (1985); *Amax Fly Ash Corp., supra; Central Soya Co. v. Geo. A. Hormel & Co.,* 205 U.S.P.Q. 421, 424 (W.D.Okla.1979), *aff'd,* 645 F.2d 847 (10th Cir.1981).

> Persons employed ... are entitled to their own independent inventions, but where the employer has conceived the plan of an invention and is engaged in experiments to perfect it, no suggestions from an *employe[e],* not amounting to a new method or arrangement, which, in itself is a complete invention, is sufficient to deprive the employer of the exclusive property in the perfected improvement. But where the suggestions go to make up a complete and perfect machine, embracing the substance of all that is embodied in the patent subsequently issued to the party to whom the suggestions were made, the patent is invalid, because the real invention or discovery belonged to another.

*Hobbs v. United States Atomic Energy Commission,* 451 F.2d 849, 865 (5th Cir. 1971) (emphasis in original) quoting *Agawam Woolen Co. v. Jordan,* 7 Wall. 583, 602–03, 74 U.S. 583, 602–03, 19 L.Ed. 177 (1869).

■ The record in this case contains substantial evidence that Mr. Weil initially conceived of the idea of an integrally knitted cubicle enclosure curtain made of inherently flame resistant yarn materials. He provided Dr. Varin with detailed instructions describing the type of fabric he wanted and what Dr. Varin should do in developing the fabric based on that conception. *See Hobbs,* 451 F.2d at 866. Mr. Weil properly used Dr. Varin's services in the development of the cubicle curtain fabric. There is no evidence that Dr. Varin's con-

tributions "embrac[e] the substance of all that is embodied in the patent subsequently issued to" Mr. Weil. *Hobbs*, 451 F.2d at 865 quoting *Agawam Woolen Co.*, 7 Wall. at 603, 74 U.S. at 603. Rather, Dr. Varin knitted prototype cubicle enclosure fabrics pursuant to Mr. Weil's instructions. Although he was skilled in the knitting art, and is knowledgeable with respect to the development and patenting of new products, Dr. Varin never conceived of the possibility of simultaneously knitting two disparate fabrics as one. Indeed, Dr. Varin agreed that Mr. Weil had developed an invention and suggested to him that he engage a firm of patent attorneys that had represented Dr. Varin and Varinit Corporation. Defendant has presented no evidence showing that the invention was not conceived solely by Mr. Weil. Indeed, when Dr. Varin was deposed by Fox-Wells, the issue of inventorship was never raised directly with him.

*Infringement*

The burden of proof is on the patent owner, here Indecor, to prove infringement by a preponderance of the evidence. *Lemelson v. United States*, 752 F.2d 1538, 1547 (Fed.Cir.1985); *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 758 (Fed.Cir.1984). In determining whether an accused device literally infringes a valid patent claim, resort must be had in the first instance to the words of the claim. "If accused matter falls clearly within the claim, infringement is made out and that is the end of it." *Graver Tank & Manufacturing Co. v. Linde Air Products Co.*, 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950).

Based upon an examination of the TOTAL CUBE fabric and consideration of the testimony of the witnesses, the Court holds that the TOTAL CUBE fabric and its use as a private cubicle enclosure curtain contain each and every feature and property of the asserted claims and that such claims are directly infringed. 35 U.S.C. § 271(a). Defendant has manufactured and produced a product with the intention that it be used as a private cubicle enclosure. Defendant knows of no other uses for its product and has advertised that its product qualifies for use as a private cubicle enclosure curtain. It has adopted the name TOTAL CUBE for its product with knowledge that Indecor called its product KOMPLETE KUBE. These facts prove that Fox-Wells infringes the '195 Patent, or otherwise contributorily infringes said patent and actively induces its customers to infringe said patent by making, offering for sale and selling the TOTAL CUBE fabric that is known by Fox-Wells to be especially made or especially adapted for use by its customers in making infringing private cubicle enclosures. 35 U.S.C. § 271(b) & (e).

*Willful Infringement*

Fox-Wells was alerted to the existence of the patent soon after it was issued on March 23, 1983 by letter dated March 30, 1983. When a potential infringer has actual notice, as in this case, of another's patent rights, he has an affirmative duty to exercise due care to determine whether he is infringing. *Underwater Devices, Inc. v. Morrison-Knudsen Co.*, 717 F.2d 1380, 1389 (Fed.Cir.1983). This affirmative duty includes the obligation to seek and to obtain competent legal advice from counsel before the initiation of any possible infringing activity. *Id.* at 1390. In this case, Fox-Wells did consult legal counsel who notified Indecor that in their opinion Fox-Wells did not infringe the patent for several reasons. However, Fox-Wells did not begin to conduct a patent search of the prior relevant art until April of 1984, well after the commencement of this litigation; nor has it ever received a legal opinion predicated upon a review of the file history of the '195 Patent and an infringement analysis that compared and contrasted the potentially infringing product with the patented invention. *See Id.* An infringer's decision to continue production after notice of a patent is evidence of willfulness. *Power Lift, Inc. v. Lang Tools, Inc.*, 774 F.2d 478, 482 (Fed.Cir.

1985). Fox-Well's failure to conduct a patent search or to receive an opinion of counsel as to the validity of the '195 Patent serve to aggravate the circumstances. *Ralston Purina Co. v. Far-Mar-Co.,* 772 F.2d 1570, 1577 (Fed.Cir.1985).

■ Fox-Well's copying of the Indecor fabric before the patent was issued does not constitute infringement. *Milgo Electronic Corp. v. United Business Communications, Inc.,* 623 F.2d 645, 666 (10th Cir.), *cert. denied,* 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980). Nevertheless, Fox-Wells' copying activities provide evidence that its conduct in manufacturing and selling infringing TOTAL CUBE fabric after March of 1983 "was intentional and deliberate, in willful disregard of [Indecor's] rights, rather than merely accidental or negligent." *Id.* Moreover, in January of 1982, Fox-Wells was advised by Texfi's attorneys that it would be proper to market the TOTAL CUBE product only "if Texfi and Fox-Wells ... developed [the] fabric independently." Fox-Wells' disregard of counsel's advice in this regard is evidence that negates an inference of good faith by reason of later consultation with patent counsel. *Central Soya Co. v. Geo. A. Hormel & Co.,* 723 F.2d 1573, 1577 (Fed.Cir. 1983).

*This Is An Exceptional Case*

■ In exceptional cases the court may award reasonable attorneys' fees to the prevailing party. 35 U.S.C. § 285. In addition to willful infringement, "exceptional" circumstances include misconduct during the litigation and vexatious or unjustified litigation, or a frivolous suit. *Standard Oil Co. v. American Cynamid Co.,* 774 F.2d 448, 455 (Fed.Cir.1985). The Court has found that the infringement by Fox-Wells is willful. In addition, Fox-Wells has engaged in dilatory tactics during the course of this litigation, as evidenced by Indecor's need to resort to Rule 37 motion practice; Judge Ward's ruling that plaintiff may apply for attorneys' fees in connection with such dispute; Fox-Wells' changes of expert witnesses and its belated and insuf-

ficient production of samples of untreated TOTAL CUBE fabric; Fox-Well's belated assertion of the co-inventorship issue and its failure to pursue discovery in connection with that issue; and its efforts to introduce into evidence, without proper justification, documents not previously identified in the Pre-Trial Order. These circumstances require the Court to conclude that this is an exceptional case justifying an award of attorneys' fees to the prevailing party, Indecor.

## CONCLUSION

On the basis of the findings of fact entered herein, the Court concludes that defendant has not proved that the '195 Patent is invalid, and that defendant has infringed the patent as to all claims at issue. Plaintiff Indecor is therefore entitled to judgment and an injunction against further infringement by Fox-Wells. Any damages that Indecor may prove in the damages portion of this proceeding should be tripled under 35 U.S.C. § 284 due to the willful nature of Fox-Wells' infringement. Further, this is an exceptional case justifying the award to plaintiff of its costs and reasonable attorneys' fees.