**LAMB–WESTON, INC., Plaintiff–Appellant,**

v.

**McCAIN FOODS, LTD. and McCain Foods, Inc., Defendants–Appellees.**

Nos. 93–1536, 94–1225.

United States Court of Appeals, Federal Circuit.

Feb. 29, 1996.

Robert E. Rohde, Bogle & Gates, Seattle, Washington, argued for plaintiff-appellant. With him on the brief were Al Van Kampen and Ramsey M. Al–Salam. Of counsel was Karen M. McGaffey.

Alan L. Unikel, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Illinois, argued for defendants-appellees.

Before PAULINE NEWMAN, MICHEL, and RADER, Circuit Judges.

Opinion of the court filed PER CURIAM, dissenting opinion filed by Circuit Judge Pauline Newman.

PER CURIAM.

The United States District Court for the Eastern District of Washington held Lamb–Weston, Inc.'s U.S. Patent No. 4,937,084 (the '084 patent) invalid and unenforceable. Because prior art renders the '084 patent obvious, this court affirms the judgment on invalidity and vacates the judgment on inequitable conduct.

## BACKGROUND

Lamb–Weston is a food processing company that sells frozen potato products. The defendants, McCain Foods companies (McCain), compete with Lamb–Weston in the frozen potato products industry. Both Lamb–Weston and McCain make partially fried (parfried) and frozen potato products. Fierce competition in the frozen potato products market spurs development of new products. This litigation centers around Lamb–Weston's development of frozen, parfried lattice-shaped french fries called "waffle fries."

In October 1979, an independent inventor, Mr. Matsler, offered to confidentially disclose his waffle fry slicing apparatus to Lamb–Weston. In January 1980, Mr. Matsler demonstrated his slicing apparatus, but 98% of the waffle fry slices were unusable. Nevertheless, Lamb–Weston began negotiations with Mr. Matsler's patent attorney to license the technology. Instead of contracting with Lamb–Weston, Mr. Matsler licensed his invention to a Lamb–Weston competitor, J.R. Simplot Company.

In December 1979, Mr. Matsler demonstrated his cutting machine to a J.R. Simplot representative. Mr. Matsler fried some of his potato slices and distributed them to customers at a local Dairy Queen Restaurant in Dallas, Oregon.

In February 1980, Lamb–Weston received a letter from Mr. Jayne, another inventor, offering to confidentially disclose his waffle fry cutting apparatus. In March 1980, Lamb–Weston evaluated Mr. Jayne's machine, but found it unacceptable. Lamb–Weston terminated communications with Mr. Jayne. Lamb–Weston then began developing its own machine, starting with a commercial machine for making waffle-style potato chips and adapting it to make waffle fries.

Lamb–Weston started testing its waffle fries in 1980 and began selling them in late 1983 under the trademark "CrissCut." In August 1983, Lamb–Weston filed a patent application in the United States Patent and Trademark Office (PTO) on the waffle-cut potato product, the slicing apparatus, and the process for making the product. The patent application had Serial No. 06/525,115 (the '115 application).

The PTO initially rejected the application because it encompassed more than one invention. 37 C.F.R. § 1.141 (1995). Lamb–Weston elected to proceed solely on the cutting apparatus claims, which issued as U.S. Patent No. 4,523,503 (the '503 patent). This patent is not at issue in this case.

Lamb–Weston separated the process claims out of the '115 application. The patent examiner initially rejected this divisional application, Serial No. 06/682,366 (the '366 application), as obvious over references disclosed on the face of the patent, namely Canada Patent No. 898,057 (Starke), U.S. Patent No. 678,514 (Regnier), U.S. Patent No. 2,612,453 (Stahmer), U.S. Patent No. 2,767,752 (Stahmer II), U.S. Patent No. 1,937,049 (Toland, et al.), U.S. Patent No. 3,139,130 (Urschel), and U.S. Patent No. 1,506,166 (Boon). Boon discloses a method for preparing frozen, partially cooked french fries. The other references disclose waffle-shaped potato products and slicing apparatus. The examiner determined that one of ordinary skill in the art would have found it obvious to freeze the waffle-cut potato products disclosed in the other references as Boon suggests.

To escape this rejection, Lamb–Weston amended the '366 application. Lamb–Weston emphasized that the prior art disclosed waffle-cut potato chips having a thickness of $\frac{1}{8}$ inch or less, unlike the Lamb–Weston invention with a thickness of about $\frac{4}{16}$ to $\frac{10}{16}$ inch. Despite the amendments, the examiner finally rejected the '366 application on January 23, 1986.

Lamb–Weston appealed the final rejection to the PTO Board of Patent Appeals and Interferences (Board). In January 1990, the Board reversed the examiner's rejection. The '366 application issued as the '084 patent, the patent in dispute in this case.

The '084 patent claims a parfried, frozen potato slice. Claims 1 through 4 of the '084 patent read:

1. A parfried potato product, suitable for reconstitution by cooking, comprising:

a frozen, sliced potato section having a substantially ellipsoidal shape and a variable thickness, including a peak to peak thickness within the range of about $\frac{4}{16}$ to $\frac{10}{16}$ inch;

the section including opposed first and second sides, each side having longitudinal ridges and grooves therebetween, the ridges and grooves of the first side extending angularly to the ridges and grooves of the second side;

the grooves of the first and second sides having a depth sufficient to intersect one another to form a grid of openings in the potato section;

the section, before reconstitution, having an oil content of about 6–20%, by weight, and a solids content of about 32–40%, by weight;

whereby the product, upon reconstitution by cooking, is characterized by very thin, crisp portions of locally increased oil flavor adjacent the openings, relatively thick portions defined by intersecting ridges having an internal mealy texture and strong potato flavor similar to thick-cut french fried potato strips, and portions of intermediate thickness whose characteristics are similar to french fried shoe string potato strips.

2. The product of claim 1 wherein the section has an oil content of about 16–20%, by weight, and a solids content of about 55–65%, by weight, after oil fry reconstitution at a temperature within the range of about 350° F to 360° F for about 135–165 seconds.

3. The product of claim 1 wherein the section has an oil content of about 16–20%, by weight, and a solids content of about 55–65%, by weight, after reconstitution, whereby the thickest portions of the product have characteristics akin to thick-cut french fried potato strips, thinnest portions have characteristics akin to potato chips and other portions have characteristics akin to french fried shoe string potato strips.

4. The product of claim 1 wherein the peak-to-peak thickness is about $\frac{7}{16}$ inch.

In 1985, McCain began making and selling frozen, parfried waffle fries. Lamb–Weston sued McCain for patent infringement, trademark infringement, unfair competition, and trademark dilution. McCain counterclaimed for a declaratory judgment of patent invalidity and unenforceability, and for damages under the antitrust laws. McCain later withdrew the antitrust claims.

The district court decided the issues of infringement, enablement, indefiniteness, and inventorship in Lamb–Weston's favor. The parties did not appeal these issues. The district court decided the trademark and unfair competition claims in McCain's favor. The parties also did not appeal these issues.

During the district court proceedings, Lamb–Weston conceded that waffle-cut potato products were known since the early 1900s. The district court found that waffle fries were available at restaurants before Lamb–Weston developed its CrissCut fry. For example, as early as 1935 and 1936 the Gem Cafe in Plainsville, Texas served waffle fries as a staple item. In 1979, the Plaza Restaurant in Quincy, Illinois sold waffle fries. In 1981, General Slicing/Red Goat Disposers sold a commercial, electric slicing machine capable of slicing $\frac{5}{16}$ inch thick waffle fry slices.

In addition, the district court examined U.S. Patent No. 3,397,993 (the Strong patent) and found it relevant to obviousness under 35 U.S.C. § 103 (1994). The Strong patent describes a parfry process where potato slices are steam-blanched, air-dried, parfried, and then frozen. Lamb–Weston, as well as other potato processing companies, uses the Strong patent parfry process to prepare frozen, parfried french fries and reconstituted fries having all the textural limitations of the '084 patent. The district court held that this process would have been familiar to a person of ordinary skill in the art at the time of Lamb–Weston's waffle fry invention.

The district court, however, did not find that the prior waffle fry uses and sales in the 1930s, and the Strong patent process, provided the motivation to combine the waffle-cut potato chips with the known parfried potato technology. The district court said, however, that the Matsler and Jayne devices provided that motivation. The district court held the '084 patent claims invalid as obvious in light of the Matsler and Jayne devices in combination with the prior parfried frozen potato technology, including the Strong patent. The district court also found Lamb–Weston's '084 patent unenforceable due to inequitable conduct. Lamb–Weston appeals obviousness and inequitable conduct determinations to this court.

STANDARD OF REVIEW

The ultimate determination of obviousness is a legal conclusion, resting on factual determinations under 35 U.S.C. § 103. *In re Vaeck*, 947 F.2d 488, 493, 20 USPQ2d

1438, 1442 (Fed.Cir.1991). This court reviews these factual underpinnings for clear error in light of the evidence. *Id.* Fed. R.Civ.P. 52(a).

## OBVIOUSNESS

■ The district court held that the Matsler and Jayne slicing devices provided the motivation for a person of ordinary skill in the art to combine the known waffle-cut potato chips with the Strong patent process to produce frozen, parfried, and reconstituted waffle fries. *Lamb–Weston, Inc. v. McCain Foods, Inc.*, 818 F.Supp. 1376, 1390 (E.D.Wash.1993). This court finds it unnecessary to examine the appropriateness of the Matsler and Jayne slicing devices as prior art, although protected under nondisclosure agreements, to provide this motivation to combine.* We find it is the potato products resulting from these slicing devices, and not merely the devices themselves, that create the motivation to combine. Unlike the slicing apparatus, the potato products were not subject to confidentiality agreements. In addition to the prior art cited to the examiner during prosecution, the district court found that waffle fries were available at restaurants as early as 1935.

In an extraordinarily thorough and carefully reasoned opinion, the district court examined the prior art applicable to the '084 patent:

The Examiner rejected the claims in the '366 application under § 103, finding

the claimed invention unpatentable over Starke, Regnier, Stahmer, Stahmer (I), Toland, et al., and Urschel, when viewed in light of Boon.

. . . .

Frozen, parfried french fries of various configurations and degrees of thickness were well known in the art at the time of the claimed invention. Major potato processors such as Lamb–Weston and McCain were producing frozen, parfried french fries in the thicknesses varying from less than a quarter of an inch to more than half of an inch. ... The two most common dry fry processes used by potato processors were taught by the Strong and Chase patents.

. . . .

It would have been obvious to one of ordinary skill in the art to take a prior art waffle-cut potato fry, cut it so that the peak to peak thickness falls within the standard $\frac{6}{16}$ to $\frac{10}{16}$ inch range for french fries, and apply a parfry process commonly used in the industry, in order to develop a frozen, parfried waffle-cut potato product suitable for reconstitution by finish frying.

*Lamb–Weston,* 818 F.Supp. at 1389–90.

■ The Matsler and Jayne waffle-shaped potato slices themselves were not subject to nondisclosure agreements. In fact, Matsler and a representative from J.R. Simplot distributed waffle-shaped potato fries at a Dairy Queen for a test. Jayne sent pictures of

---

* This court need not reach the significant issue of whether section 102(f) of title 35 defines prior art for an obviousness determination under section 103 because, among other reasons, the Matsler and Jayne potato slices were separate from the machines that produced them and were not confidential. In any event, this court need not reach this issue. The dissent has provided certain citations of authority for the proposition that section 102(f) may not be used as prior art under section 103. However, the following contrary authorities should also be considered: 35 U.S.C. § 103 (1994) ("Subject matter developed by another person *which qualifies as prior art only under subsection (f)* or (g) of section 102 [shall not preclude patentability if owned by the same entity].") (emphasis added); 2 Donald S. Chisum, *Patents,* § 5.03[3] (1994) ("However, it is now clear that section 102(e) (description in prior copending patent application that ripens into a patent), section 102(g) (prior invention), and *sec-*

*tion 102(f) (derivation from another)* may also be relied upon to show obviousness.") (emphasis added); *Dale Elec. v. R.C.L. Elec.,* 488 F.2d 382, 386, 180 USPQ 225, 227 (1st Cir.1973) (Actual knowledge of invention by another makes references defined by 102(f) prior art for obviousness determinations.); *New England Braiding Co. v. A.W. Chesterton Co.,* 970 F.2d 878, 883, 23 USPQ2d 1622, 1626 (Fed.Cir.1992) ("To invalidate a patent for derivation of invention, a party must demonstrate that the named inventor ... acquired knowledge of the claimed invention from another, or at least *so much of the claimed* invention as would have made it obvious to one of ordinary skill in the art."); 37 C.F.R. § 1.106(d) (1995) ("Subject matter which is developed by another person which qualifies as prior art only under 35 U.S.C. 102(f) or (g) may be used as prior art under 35 U.S.C. 103 against a claimed invention ...").

waffle-sliced potatoes from his machine to manufacturers, including Lamb–Weston. These disclosures were not secret. Therefore, these disclosures fall within the terms of prior art defined by section 102(a) or section 102(g).

Although the district court should have found the motivation to combine without examining the Matsler and Jayne devices, the district court reached the correct conclusion of obviousness. While the district court expressed the motivation to combine in terms of the Matsler and Jayne devices and section 102(f), the district court actually found a motivation for the claimed invention in reviewing the Matsler and Jayne potato product where it was lacking in the prior art references before the Board. Parfried potato products were well known in the prior art. However, no reference to a waffle-cut potato product of sufficient thickness to merit parfrying, was before the Board. Because the references before the Board were thin like potato chips, the Board did not conclude that one of ordinary skill in the art would have frozen a conventional potato chip and reconstituted it by frying. In contrast, the district court found that "[t]he correspondence exchanged between Matsler and Lamb–Weston indicate[d] that the device was intended to cut french fries and not potato chips." *Lamb–Weston*, 818 F.Supp. 1376 at 1389. Even though the district court need not have found the motivation to combine in the Matsler and Jayne devices, any error was harmless because the district court reached the correct conclusion of obviousness.

Ample prior art suggests a motivation to cook potato products of various shapes using a parfry process. For example, the Strong patent describes a parfry process used on shoe-string french fries. The Matsler and Jayne potato products, however, supplied waffle-shaped potato products of the appropriate thickness for the known parfry process. The motivation to combine arose, therefore, because the size and shape of Matsler and Jayne potato products suggested application of the parfry process to thicker products.

The motivation to parfry the Matsler and Jayne potato products in making the claimed invention derives from (1) the extensive prior art disclosing the desirability of parfrying potato products, and (2) the suitability of the Matsler and Jayne potato products for the parfry process. The evidence of prior use and sale of waffle fries and parfried potato products, in addition to the Matsler and Jayne potato slices, provides sufficient motivation to combine the known waffle-cut shape and the parfry cooking method of the Strong patent. This combination renders the '084 patent obvious.

Because patented before Lamb–Weston's invention, the references disclosed to the patent examiner were prior art under section 102(a) of title 35. Similarly, the knowledge and use of waffle fries in the 1930s occurred before the invention and are prior art under section 102(a). The potato products produced from the Matsler and Jayne slicing apparatus were not under nondisclosure agreements and therefore qualify as prior art under section 102(a). This court is not applying a new rule of obviousness in this case. These relevant references count collectively toward the teachings of prior art as a whole. *EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 225 USPQ 20 (Fed.Cir.), *cert. denied*, 474 U.S. 843, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985).

The prior art parfried potato product references and the knowledge and use of waffle-cut potato products of sufficient thickness and shape suitable for parfrying, as exemplified by the Matsler and Jayne potato products and the waffle fries sold in the 1930s, provided the motivation to combine the waffle-cut shape with the parfry process of the Strong Patent. The prior art suggests the desirability and the obviousness of such a combination. The claims of the '084 patent are invalid as obvious.

### UNENFORCEABILITY

■ This court need not reach the unenforceability issue of the '084 patent; it is thus vacated. Such a decision not to review unenforceability is not inconsistent with the Supreme Court's mandate in *Cardinal Chemical Co. v. Morton International, Inc.*, 508 U.S. 83, 113 S.Ct. 1967, 124 L.Ed.2d 1, 26

USPQ2d 1721 (1993). The question in that case was "whether the affirmance by [this court] of a finding that a patent has not been infringed is a sufficient reason," by itself, "for vacating a declaratory judgment holding the patent invalid." *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1060, 35 USPQ2d 1139, 1144 (Fed.Cir.1995) (quoting *Cardinal Chemical*, 508 U.S. at 84–86, 113 S.Ct. at 1969). The Supreme Court's decision in *Cardinal Chemical* is limited to the specific facts of that case. Specifically, an affirmance by this court of a finding of noninfringement is not, by itself, enough to vacate a declaratory judgment holding the patent invalid.

The Supreme Court specified that factors such as judicial economy may nevertheless support a determination not to review validity. Unlike the situation in *Cardinal Chemical*, however, this court has determined invalidity. It is merely unenforceability that is set aside. There is no risk that others will be subject to infringement suits in the future because Lamb–Weston's '084 patent is invalid. There is no need to secure this court's determination regarding the unenforceability of an invalid patent.

This court affirms the invalidity judgment because the '084 patent is obvious in light of the prior art. This court vacates the inequitable conduct claim because it is redundant under these circumstances.

### COSTS

Each party shall bear its own costs.

*AFFIRMED and VACATED.*

1. *Lamb–Weston, Inc. v. McCain Foods, Inc.*, 818 F.Supp. 1376 (E.D.Wash.1993) and *Lamb–Weston, Inc. v. McCain Foods, Inc.*, No. CY–90–3082–AAM (E.D.Wash. Oct. 6, 1993) (final judgment).

2. Claims 1 and 4 are as follows:
  1. A parfried potato product, suitable for reconstitution by cooking, comprising:
  a frozen, sliced potato section having a substantially ellipsoidal shape and a variable thickness, including a peak to peak thickness within the range of about $\frac{9}{16}$ to $\frac{10}{16}$ inch;
  the section including opposed first and second sides, each side having longitudinal ridges and grooves therebetween, the ridges and grooves of the first side extending angularly to the ridges and grooves of the second side; the grooves of the first and second sides having a depth sufficient to intersect one an-

PAULINE NEWMAN, Circuit Judge, dissenting.

The district court's rulings of both obviousness and inequitable conduct depend on the court's application of the law of derivation, 35 U.S.C. § 102(f). The district court found that the prior art lacks a teaching, suggestion, or motivation to combine the references that are necessary to make the invention obvious,[1] and then erroneously invoked § 102(f) to provide that motivation. The panel majority finds "motivation" simply in its observation that raw and fully cooked waffle-cut potatoes existed in the prior art, apparently holding that the mere thickness of these known products as compared with potato chips is the "motivation" that made obvious the invention of a previously unknown product, as described in claims 1 and 4 of the patent in suit.[2] The panel majority holds that this new product would have been obvious, despite the failure of the industry to have produced it, the several years of experimentation and development incurred by Lamb–Weston, and the absence of teaching or suggestion in the prior art as to what to make and how to make it. Lamb–Weston's recognition of the potential of its proposed new product is not the teaching, suggestion, or motivation that precedent requires. *See Uniroyal, Inc. v. Rudkin–Wiley Corp.*, 837 F.2d 1044, 1050–51, 5 USPQ2d 1434, 1439 (Fed.Cir.) (the prior art must contain the suggestion to make the specific combination that is claimed), *cert. denied*, 488 U.S. 825,

other to form a grid of openings in the potato section;
  the section, before reconstitution, having an oil content of about 6–20%, by weight, and a solids content of about 32–40%, by weight;
  whereby the product, upon reconstitution by cooking, is characterized by very thin, crisp portions of locally increased oil flavor adjacent the openings, relatively thick portions defined by intersecting ridges having an internal mealy texture and strong potato flavor similar to thick-cut french fried potato strips, and portions of intermediate thickness whose characteristics are similar to french fried shoe string potato strips.
  4. The product of claim 1 wherein the peak-to-peak thickness is about $\frac{7}{16}$ inch.

109 S.Ct. 75, 102 L.Ed.2d 51 (1988); *In re Geiger,* 815 F.2d 686, 688, 2 USPQ2d 1276, 1278 (Fed.Cir.1987) (obviousness is not established by combining the teachings of the prior art "absent some teaching, suggestion, or incentive supporting the combination."). Indeed, the long existence of raw and fully cooked waffle-cut potatoes if anything weighs against the obviousness of producing such a product in partially fried and frozen form. Commercial success, failure of others, and copying, are all evidence of unobviousness, not obviousness. *See Graham v. John Deere Co.,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 148 USPQ 459, 467 (1966); *Cooper v. Ford Motor Co.,* 748 F.2d 677, 679, 223 USPQ 1286, 1287 (Fed.Cir.1984).

## A. Recognition of the Value of a New Product is not a "Motivation" in the Prior Art

It is undisputed that raw and cooked waffle-cut potatoes have long been known. It is also undisputed that the prior art does not show partially fried and frozen waffle-cut potatoes, capable of reconstitution to provide a mixture of tastes and textures as described in the '084 patent. On reconstitution the thinnest regions at the edges of the grid openings are described as tasting like crisp potato chips, the thickest regions like thick-cut french fried potatoes, and the intermediate regions like shoestring potatoes.

On reconstitution the product must be cooked all the way through, not raw on the inside; it must be mealy, not greasy, limp, or starchy; and it must be crisp yet not caramelized (burnt) on the thinnest portions. There was testimony that the greater the contrast between the thickest and thinnest portions in the waffle cut, the more uncertain the successful production of a partially fried and frozen product that can be successfully reconstituted.

The prior art shows waffle-cut potatoes, raw and fully cooked; the prior art shows thin lattice-cut potato chips; and the prior art shows partially fried and frozen potatoes, generally in the french-fry shape. The novelty of the claimed product is not disputed. The PTO Board has recognized that for a combination of prior art references to render an invention obvious, "[t]here must be some reason, suggestion, or motivation found in the prior art whereby a person of ordinary skill in the field of the invention would make the combination." *In re Oetiker,* 977 F.2d 1443, 1447, 24 USPQ2d 1443, 1446 (Fed.Cir. 1992). The Board correctly declined to reason backward from the Lamb–Weston invention and allowed the claims, explaining that "the examiner has not established the requisite motivation which would have led one having ordinary skill in the art to modify the primary references [lattice shaped sliced potatoes] by preparing a frozen potato product." No ensuing information has materially affected this reasoning.

## B. The District Court Recognized the Absence of Suggestion to Combine Prior Art References

The district court had a more extensive collection of prior art than was before the patent office, but within the same two groups of subject matter. In one group were the waffle-cut potatoes, raw and cooked, and assorted devices to aid in cutting this shape. Several machines had been devised in attempts to mechanize the cutting, including those of Messrs. Matsler and Jayne, although none produced a waffle-cut slice thicker than six millimeters, or 0.236 inch.

The other group of prior art references showed partially fried and frozen potatoes. Several manufacturers made such products, particularly in french-fry shape. Lamb–Weston's witnesses, including persons employed by Lamb–Weston's competitors, testified as to the technologic problems caused by the varying thicknesses of the waffle-cut potato. Witnesses pointed out the difficulties in producing a partially fried and frozen product that would on reconstitution be fully cooked and pleasant tasting in its thickest parts without being burnt or unpleasant in taste or texture in any other parts. Witnesses testified that it required several years of work for Lamb–Weston to achieve such a product. An employee of a competitor (Simplot) testified that

> it was very difficult to control the textures. The laboratory people had put in a lot of time and effort into trying to understand

the blanching times, frying times, and process parameters in general, to come up with a product that would even be acceptable to our standards of a product going into the food service marketplace.

It was not challenged that Lamb–Weston conducted extensive experimentation in the course of developing the patented product. Several competitors had seen and tested the Matsler and Jayne machines and products, but none had made the invention made by Lamb–Weston. The failure of others to do what the patentee achieved is strong evidence of nonobviousness. *Uniroyal Inc. v. Rudkin–Wiley, Corp.*, 837 F.2d at 1054, 5 USPQ2d at 1440–41; *see W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1553, 220 USPQ 303, 313 (Fed.Cir.1983) (objective considerations serve "as insurance against the insidious attraction of the siren hindsight"), *cert. denied*, 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984); *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538, 218 USPQ 871, 879 (Fed.Cir.1983) ("Evidence of secondary considerations may often be the most probative and cogent evidence [of nonobviousness] in the record.")

The district court recognized, as had the Board, that the prior art contained no teaching, suggestion, or motivation to select from the two groups of references in the way that would produce the product described and claimed in the '084 patent. However, the district court found such "motivation" in the machines of Messrs. Matsler and Jayne. The district court did not find that Mr. Matsler or Mr. Jayne knew or taught how to make the partially fried/frozen waffle-cut potatoes of the '084 patent. However, the district court found that the Matsler and Jayne machines and their known waffle-cut product were prior art for the purpose of "derivation" under § 102(f),[3] and that when combined with the other prior art they filled the gap in the § 103 obviousness determination. In this the district court erred, for even if the

disclosure of these machines and their product spurred Lamb–Weston into action, inspiration or spur is not a "teaching, suggestion, or motivation" to combine selected references in a specific way to make a specifically detailed new product.

To defeat patentability based on obviousness, the suggestion to make the new product having the claimed characteristics must come from the prior art, not from the hindsight knowledge of the invention that was made by Lamb–Weston. *See Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1143, 227 USPQ 543, 551 (Fed.Cir.1985):

> When prior art references require selective combination by the court to render obvious a subsequent invention, there must be some reason for the combination other than the hindsight gleaned from the invention itself. There must be "something in the prior art as a whole to suggest the desirability, and thus the obviousness, of making the combination."

(citing *ACS Hosp. Sys., Inc. v. Montefiore Hosp.*, 732 F.2d 1572, 1577 & n. 14, 221 USPQ 929, 933 & n. 14 (Fed.Cir.1984), and *Lindemann Maschinenfabrik GMBH v. American Hoist and Derrick Co.*, 730 F.2d 1452, 1462, 221 USPQ 481, 488 (Fed.Cir. 1984)).

The district court found that Lamb–Weston received an idea from Matsler and Jayne that "when combined with the relevant prior art and the ordinary level of skill in the art, renders the claimed invention obvious," the court holding the patent invalid under § 102(f) combined with § 103. *Lamb–Weston*, 818 F.Supp. at 1388. The district court held that "[t]he derived information constitutes prior art under Section 102(f) even if it is secret, has not been reduced to practice, or is abandoned." *Id.* That is not a correct general statement, for secret or abandoned knowledge is not prior art.[4] Derived knowledge can indeed be invalidating, but it is not

---

3. **35 U.S.C. § 102.** A person shall be entitled to a patent unless—

  . . . .

  (f) he did not himself invent the subject matter sought to be patented.

4. Except for the condition stated in 35 U.S.C. § 102(e) whereby, upon issuance of a patent, the

filing date is deemed its effective date for prior art purposes, despite the secrecy of pending patent applications. If the patent application does not issue (and is not referred to in an issued patent) its content remains secret and does not become prior art.

properly described as "prior art," which is defined as actual or presumed public knowledge. In *Kimberly–Clark Corp. v. Johnson & Johnson,* 745 F.2d 1437, 223 USPQ 603 (Fed.Cir.1984), the court explained that prior art in patent law is knowledge that is available to the public:

> [I]t has been unusual that opinions have explained the real reason for the denial of patent rights, which is the basic principle (to which there are minor exceptions) that no patent should be granted which withdraws from the public domain technology already available to the public. It is available, in legal theory at least, when it is described in the world's accessible literature, including patents, or has been publicly known or in the public use or on sale "in this country." 35 USC § 102(a) and (b). That is the real meaning of "prior art" in legal theory—it is knowledge that is available, including what would be obvious from it, at a given time, to a person of ordinary skill in an art.

*Id.* at 1453, 223 USPQ at 614 (citations omitted). Thus 35 U.S.C. § 102(a) and (b) define prior art as what is known in the literature or deemed to be publicly available through use or sale, and § 102(e) establishes an inference of public knowledge of an issued patent as of its filing date. Sections 102(c), (d), (f), and (g) state additional conditions of patentability, and serve different purposes than do the prior art provisions.

Section § 102(f) relates to "derivation," the taking of the invention of another and patenting it as one's own. It is irrelevant whether or not that invention is also prior art. As explained in *In re Bass,* § 102(f) relates to originality, that "one who 'did not himself invent the subject matter' (*i.e.,* he did not originate it) has no right to a patent on it." *In re Bass,* 474 F.2d 1276, 1290, 59 CCPA 1342, 177 USPQ 178, 189 (1973) (legislatively modified on other grounds). The court explained in *Bass* that § 102(f) has "no relation to § 103 and no relevancy to what is 'prior

art' under § 103." 474 F.2d at 1290, 177 USPQ at 189. As summarized in 2 Donald S. Chisum, *Patents* § 5.03[3][c][vi][B] (Rel. 55 1995):

> A few decisions by lower courts and the Board of Appeals view specific derived knowledge as prior art under [§ 102(f) ], but neither the Federal Circuit nor its two predecessor courts . . . has so held.

Thus § 102(f) prohibits the patenting of an invention made by someone else. However, the district court did not find that Mr. Matsler or Mr. Jayne invented the subject matter of the '084 patent. Their communication to Lamb–Weston was a machine and its product. The product was already known to the art. There is no allegation that Lamb–Weston obtained a patent on subject matter that "he did not himself invent," *Bass, supra.* A patented invention is not "derived" from another person unless that other person was in possession of the invention.

Accepting for the purpose of this discussion that Messrs. Matsler and Jayne spurred Lamb–Weston's interest in developing the patented product, § 102(f) is not concerned with inspiration or spur. Whatever the relationship between Lamb–Weston and Mr. Matsler or Mr. Jayne, invalidity based on derivation requires that the patentee, in the words of the statute, did not invent the subject matter that was patented. The district court erred in holding that in accordance with § 102(f) the Matsler and Jayne machines and products filled the gap in the teachings of the prior art by motivating Lamb–Weston to make the invention described in the '084 patent. As I have discussed, a commercial motivation is not a technologic suggestion to combine reference teachings. The panel majority similarly errs, although without reliance on § 102(f), in holding that the known waffle-cut potatoes produced on the Matsler and Jayne machines provided the motivation to make the invention of the '084 patent.[5]

---

5. The panel majority cites by footnote the second paragraph of § 103 as "authority" for the proposition that § 102(f) information is prior art. The cited provision was added to § 103 in 1984, to facilitate team research by precluding the citation of the work of one team member as prior art against the invention of another. See Section by Section Analysis, 130 Cong.Rec. H10525, H10527 (Oct. 1, 1984) *reprinted in* 1984 U.S.C.C.A.N. 5827, 5833. The majority also cites *Dale Elect. v. R.C.L. Elect.,* 488 F.2d 382, 180 USPQ 225 (1st. Cir.1973), which states broadly

### C. This Court's Incorrect New Criterion of Obviousness

Although it was apparent to the Board, and indeed to the district court, that the '084 invention would not have been obvious from the prior art, the majority of this panel holds that the existence of waffle-cut potatoes, which had been known for many decades, "creates the motivation to combine" the prior art references. The panel majority finds this motivation in "the knowledge and use of waffle fries sold in the 1930s," and states that "The evidence of prior use and sale of waffle fries, in addition to the Matsler and Jayne potato slices, provides sufficient motivation to combine the known waffle-cut shape and the parfry cooking method of the Strong Patent." That is, the panel majority holds that the prior existence of raw and fully cooked waffle-cut potatoes provided the motivation to combine previously uncombined references to make the new parfried frozen product under the selected conditions described and claimed in the '084 patent.

The Federal Circuit has attempted to set a uniform standard whereby the teaching, suggestion, or motivation to combine prior art information must itself come from the knowledge in the prior art. The concept of a new product is not the "motivation" that negates patentability. That inventors hope to profit from their invention is irrelevant to the determination of obviousness. The motivation to which precedent is directed is that which would make obvious the technologic advance, not the motivation to achieve a competitive advantage.

### D. Inequitable Conduct

The district court held that there was inequitable conduct because Lamb–Weston did not tell the patent examiner of the Matsler and Jayne machines and their product, which the district court viewed as prior art under § 102(f). This position was incorrect, as I have discussed, and the district court's hold-

ing of inequitable conduct should be reversed.

### Summary

The PTO Board held that there was no suggestion in the prior art to combine the prior art references to make the claimed product. The district court agreed, but found such suggestion in Messrs. Matsler and Jayne's unsuccessful machines and known potato product, holding that these were prior art under § 102(f). The panel majority finds the motivation to combine prior art references in the existence of the known waffle-cut potato and in the potential commercial value of the patented invention. I respectfully, but with concern, dissent from this court's departure from the laws of § 102(f) and § 103.

---

that all of § 102 qualifies as prior art, an oversimplification never endorsed by the Federal Circuit. Nor does the partial quotation from *Chisum*, or the usage in *New England Braiding*, advance consideration of the matter. Should there indeed be the conflict proposed by the

panel majority our obligation is to resolve it, particularly because of the incorrect application of § 102(f) by the district court as reported at 818 F.Supp. 1376. Further, the panel majority inappropriately intermingles its § 102(f) analysis with the issue of confidentiality.